SIRI & GLIMSTAD LLP
Catherine Ybarra (SBN 283360)
Email: cybarra@sirillp.com
700 S. Flower Street, Suite 1000
Los Angeles, CA 90017
Telephone 213-376-3739
Facsimile 646-417-5967

SIRI & GLIMSTAD LLP
Aaron Siri (*pro hac vice filed concurrently*)
Email: aaron@sirillp.com
Elizabeth A. Brehm (*pro hac vice filed concurrently*)
Email: ebrehm@sirillp.com
745 Fifth Avenue, Suite 500
New York, NY 10151
Telephone 212-532-1091
Facsimile 646-417-5967

SIRI & GLIMSTAD LLP
Allison R. Lucas (*pro hac vice filed concurrently*)
Email: alucas@sirillp.com
220 West Congress Street, 2nd Floor
Detroit, MI 48226
Telephone 313-251-9161
Facsimile 646-417-5967

SIRI & GLIMSTAD LLP
Walker D. Moller (*pro hac vice filed concurrently*)
Email: wmoller@sirillp.com
1005 Congress Avenue, Suite 925-C36
Austin, TX 78701
Telephone 512-265-5622
Facsimile 646-417-5967

CHRIS WIEST ATTORNEY AT LAW, PLLC
Christopher Wiest (*pro hac vice filed concurrently*)
Email: chris@cwiestlaw.com
50 E. Rivercenter Blvd., Suite 1280
Covington, KY 41011
Telephone: 513-257-1895

1

Facsimile: 859-495-0803

*Attorneys for Plaintiff*
Suran Thrift

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| SURAN THRIFT,<br><div align="center">Plaintiff,</div><br>v.<br>MICHAEL V. DRAKE, in his official capacity as President of the UNIVERSITY OF CALIFORNIA, and DR. DAVID RUBIN, in his official capacity as Executive Vice President for University of California – Health, of the UNIVERSITY OF CALIFORNIA,<br><div align="center">Defendants.</div> | Case No.  2:24-cv-01034<br><br>**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

The straightforward legal issue presented is whether the Regents of the University of California, by and through Michael V. Drake, its President, and Dr. David Rubin, the Executive Vice President for the University of California Health (collectively, "**Defendants**"), can deny continued enrollment to Suran Thrift ("**Ms. Thrift**" or "**Plaintiff**"), an employee of UCLA, who has sincerely held religious convictions against receiving the vaccines required by Defendants, in the University of California, Los Angeles ("**UCLA**") Master of Library & Information Science program ("**MLIS Program**"), while simultaneously allowing discretionary secular (medical) exemptions to the vaccination requirements and other comparable secular activity. Because Defendants' vaccination policy violates the United States Constitution, Plaintiff requests declaratory and injunctive relief.

Plaintiff, for her verified complaint against Defendants, by and through her attorneys, alleges as follows:

<div align="center">2</div>

## **INTRODUCTION**

1.     The University of California ("**UC**") requires certain vaccinations for incoming students prior to enrollment or registration. **Exhibit 1** (UCLA Immunization Requirement); **Exhibit 2** (UC—Policy UC-HS-17-0320) (the "**Policy**").

2.     UC's stated goal in creating the Policy is to "[mitigate] the risk of [UC] students contracting vaccine-preventable illnesses that could be acquired in a **University facility**" and that the "diseases targeted by this Policy include those that are spread by respiratory transmission, and therefore can pose a risk to others attending classes, living in residence halls, **using other University facilities** or attending University events." Ex. 2 at 1-2 (emphasis added).

3.     The Policy applies to Ms. Thrift as a student in UC's MLIS program, even though she is and has been an employee of UCLA and has accessed and accesses a "University facility" as an employee several times per week without being required to have received these vaccines. Pursuant to the Policy, Ms. Thrift is required to receive or provide proof of two doses of measles, mumps, and rubella ("**MMR**"); two doses of the Varicella (chicken pox) vaccine; and one tetanus, diphtheria, and acellular pertussis ("**Tdap**") vaccine (collectively, the "**Required Vaccines**"), or, in some instances, proof of prior infection and natural immunity. Ex. 1 at 1.

4.     The UC Immunization Exemption Policy permits exemptions from the Required Vaccines for secular (medical) reasons yet prohibits exemptions for religious reasons: "Requests for exemptions for non-medical reasons will be denied and are not eligible for appeal." Ex. 2 at 8; **Exhibit 3** (University of California Immunization Exemption Policy) at 1.

5.     Medical exemption requests to the Policy are reviewed on an individualized, discretionary, and case-by-case basis.

6.     Multiple layers of personalized and individualized review of medical exemption requests are performed. At each level, UC representatives possess the discretion to approve or deny each medical exemption request.

7.     However, Defendants have made a categorical decision that no commensurate process shall be allowed for those desiring to be exempt from the Policy for religious reasons.

8.     Moreover, UC routinely permits (i) unvaccinated students who are non-compliant with the Policy to register and attend courses for a full quarter and (ii) unvaccinated students who are appealing a denied medical exemption to enroll and attend classes for up to 60 days during the appeals process. Ex. 3 at 2.

9.     Pursuant to its medical exemption policy, UC has granted medical exemptions to the Required Vaccines. These students with medical exemptions pose at least the same purported risk to Defendants' infectious disease-related goal as permitting Plaintiff the option to pursue a religious exemption to the Policy.

10.     Moreover, pursuant to its medical exemption policy, Defendants have granted secular exemption requests yet refuse a single part-time student who does not reside on campus to request a religious exemption to the Policy.

11.     The aggregation of individual behaviors Defendants permit—medical exemptions; students who are permitted to attend classes while out of compliance with the Policy; employees, professors, and staff who are not subject to the Policy; and the general public who have not received vaccines required under the Policy but who regularly intermingle on Defendants' campuses and facilities, all further outlined *infra* ¶¶ 81-105 — all collectively pose a dramatically greater risk to Defendants' asserted goal than would permitting Plaintiff a process to pursue a religious exemption.[1]

---

[1] The aggregation of these behaviors is herein collectively referred to as "secular activity."

12.    Further, the secular activity Defendants permit poses a significantly greater risk to Defendants' asserted goal than would permitting a religious exemption option to the Policy to all students and potential students in Defendants' educational programs.

13.    Ms. Thrift is employed at UCLA as a policy analyst and has worked for UC for more than seven years. When UC instituted a COVID-19 vaccine requirement in 2021, Ms. Thrift submitted a religious exemption request on July 17, 2021, based on her sincerely held religious beliefs that prevent her from receiving vaccinations.

14.    After receiving Ms. Thrift's request for a religious exemption to the COVID-19 vaccine requirement, UCLA required her to attend an interview to answer questions about her religious beliefs, objections, and the sincerity of both. Based on Ms. Thrift's religious exemption application and the responses she provided during the interactive video interview, UCLA determined that Ms. Thrift's beliefs and objections to receiving vaccination were religious and sincere and granted her a religious exemption to its COVID-19 vaccine requirement on September 26, 2022.

15.    Ms. Thrift matriculated as a part-time MLIS student at UCLA on September 29, 2023, when she attended her first MLIS course. Ms. Thrift takes two classes per quarter and attends class twice per week.

16.    While Ms. Thrift completed her first quarter in the MLIS Program, she was not in compliance with the Policy. Currently, Ms. Thrift is taking classes during a second quarter at UCLA and is not in compliance with the Policy. On belief, Defendants regularly permit many other students like Ms. Thrift, who are out of compliance with the Policy, to enroll in and attend classes. *See, e.g.*, Ex. 3 at 2 (medical exemption policy permitting unvaccinated students to enroll and attend classes while request and/or appeal is processed).

17.     Defendants have placed a hold on Ms. Thrift's account based on her noncompliance with the Policy. This prevents her from enrolling in any additional courses and will result in her disenrollment from the MLIS Program.

18.     Throughout her first and second quarters, Ms. Thrift was an employee of UCLA and worked in person at UCLA facilities.

19.     On November 21, 2023, Ms. Thrift spoke with an employee at UCLA Arthur Ashe Student Health & Wellness Center ("**Ashe Center**") to request a religious exemption to the Policy and was told that no such option existed. However, even though there was no religious exemption option and even though Ms. Thrift was non-compliant with the Policy, the representative granted Ms. Thrift an extension to comply until December 31, 2023, permitting Ms. Thrift to register for courses for the current (winter) quarter. Nevertheless, the hold remains in place, so she will be unable to register for the next quarter, for which enrollment begins on February 15, 2024, the deadline to register is April 12, 2024, and for which tuition is due on March 20, 2024.

20.     In short, Ms. Thrift's religious beliefs are substantially burdened by the Policy, which explicitly prohibits religious exemptions and denies an education to unvaccinated religious students but permits students who are unvaccinated for secular reasons to access the benefits of an education at UC and other benefits of UC facilities.

21.     Ms. Thrift's religious exemption request was denied by UC because Defendants have made an unconstitutional value judgment that religious reasons for opting out of the Policy are prohibited but that secular reasons for opting out of the Policy are welcomed.

22.     Based exclusively on her religious beliefs that preclude vaccination, Defendants prohibit Ms. Thrift from registering for additional courses beyond this

quarter while allowing her to continue working as an in-person employee of UCLA and accessing UCLA facilities.

23. Prohibiting one exemption (religious) while permitting another (medical) is confirmation that the exclusion of students with religious objections to vaccination is not the result of an absolute priority to ensure that every student is vaccinated.

24. The fact that Ms. Thrift is ineligible to complete the MLIS Program is not an incidental consequence of a neutral, generally applicable policy.

25. Defendants' "no religious exemptions" policy in this factual scenario, runs afoul of numerous United States Supreme Court and federal court decisions. *See Employment Div., Dep't of Human Resources of Ore v. Smith*, 494 U.S. 872 (1990); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993); *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719 (2018); *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020); *Tandon v. Newsom*, 141 S. Ct. 1294 (2021); and *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021); *see also Bosarge v. Edney, et al.*, 1:22-cv-233-HSO-BWR (S.D. Miss. Apr. 18, 2023); and *Fraternal Order of Police v. Newark*, 170 F.3d 359 (3d Cir. 1999).

26. Undermining any purported goal Defendants may have in requiring vaccinations—**even for those students who already access UC facilities each week as employees**—is the fact that, other than placing a registration hold on student accounts, Defendants do not otherwise intrude into the lives of unvaccinated students, employees, staff, and others who have in-person contact on campus. Defendants permit a myriad of secular activities. For example, they do not require proof of vaccination from those attending sporting events or otherwise accessing the

campus.[2] In fact, each year, "an estimated half-million people visit [UCLA] to enjoy more than 1,000 [events]." https://luskinconferencecenter.ucla.edu/about/things-to-do-ucla-old/.

27.   Defendants' refusal to provide Ms. Thrift a religious exemption option when they readily provide discretionary secular medical exemptions is unconstitutional under the First Amendment's Free Exercise Clause. The Supreme Court in *Fulton*, 141 S. Ct. 1868, made clear that where the government provides discretionary secular exemptions to a policy, the First Amendment demands that it also provide a process to pursue a religious exemption.

28.   Moreover, UC permits a myriad of comparable secular activities (from a risk perspective), while religious exemptions are forbidden, which fatally undermines the neutrality and general applicability of the Policy under *Tandon*, 141 S. Ct. at 1296.

29.   Ms. Thrift asserts, in her as applied challenge to the Policy, that its specific application to her situation violates the First Amendment.

30.   Defendants' actions have deprived and will continue to deprive Plaintiff of her inalienable rights under the United States Constitution.

31.   Defendants' actions have irreparably harmed and will continue to irreparably harm Plaintiff.

32.   Defendants committed each act alleged herein under the color and authority of California law.

## **PARTIES**

33.   Plaintiff Suran Thrift resides in Los Angeles County, California. Ms. Thrift is an employee of UCLA. She was permitted to matriculate in the MLIS

---

[2] UCLA welcomes the public to its recreational programs, aquatic center, sculpture garden, UCLA stores, twelve dining options, library, student union, and campus tours.

Program at UCLA and is currently attending on-campus, in-person courses as a part-time graduate student.

34.     Defendant Dr. Michael V. Drake is the president of the University of California and acted under color of law at all times relevant hereto. Dr. Drake is responsible for implementing and enforcing the challenged Policy and has directed, implemented, and enforced the Policy against students whose religious beliefs preclude vaccination. He is sued in his official capacity for prospective declaratory and injunctive relief.

35.     Defendant Dr. David Rubin is the Executive Vice President for the University of California Health, acted under color of law at all times relevant hereto, and is the designated responsible official for the implementation of the challenged Policy, including at UCLA, and is sued in his official capacity for prospective declaratory and injunctive relief.

36.     Defendants are responsible for enforcing, have enforced, and will continue to enforce in the future, the challenged Policy against Plaintiff, unless enjoined.

## JURISDICTION AND VENUE

37.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343(a).

38.     Venue is proper in this judicial district under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

## FACTUAL BACKGROUND

**I.   PLAINTIFF'S EMPLOYMENT AT UCLA AND DETAILS OF THE RELIGIOUS EXEMPTION UCLA PREVIOUSLY GRANTED HER**

39.     Ms. Thrift attended UC as an undergraduate student from 1989 to 1993 and as a graduate student from 1994 to 1997 without the Required Vaccines.

9

40.     Ms. Thrift is a full-time employee at UCLA as a policy analyst and has served in this position for over seven years.

41.     Pursuant to her full-time employment at UCLA, Ms. Thrift is currently required to physically report to work two days per week for eight-hour shifts. The location varies but is always at a UCLA facility. When appearing in person for work, Ms. Thrift is in a shared office space with 20 to 60 UCLA employees, and further, **students routinely access these same facilities**.

42.     As an employee, Ms. Thrift submitted a religious exemption request for UCLA's COVID-19 vaccine requirement in July 2021 based on her sincerely held religious beliefs that prevent her from receiving vaccinations.

43.     In addition to verbally requesting a religious exemption to the Required Vaccines on November 21, 2023, Ms. Thrift submitted a written request on February 5, 2024, with a statement detailing her religious beliefs and objections to receiving the Required Vaccines. She submitted the request via email to the employee at the Ashe Center that she spoke with in November 2023. The Ashe Center employee directed her to submit the request to Brad Buchman, Medical Director, and Ms. Thrift did so on the same day. On February 6, 2024, Mr. Buchman responded and directed Ms. Thrift back to the Ashe Center.

44.     As described in her statement, Ms. Thrift believes in the supreme god/lord Ishvara and his many forms. Ms. Thrift's faith informs every part of her life, including medical and nonmedical decisions, diet, how she treats her body (including her blood and organs), entertainment, and daily interactions and practices. Ms. Thrift closely considers any medical care in prayer and spiritual consultation. Ms. Thrift has held these beliefs for over thirty years.

45.     Ms. Thrift is opposed to receiving the Required Vaccines because she believes in the preservation and sanctity of life and, further, is religiously and morally opposed to the Required Vaccines' use of aborted fetal cell lines. To Ms.

Thrift's knowledge, she does not consume products derived or harvested from humans. She believes life begins at conception, and the lifeforce intention is already existing in the female body and male body. She believes abortion is the karma of killing and human fetal tissue in vaccines and other medical processes is spiritually tainted material. The MMR and varicella vaccines used aborted fetal cell lines in their testing, production, or manufacture. *See* **Exhibit 4** (Dr. Stanely Plotkin's deposition and complete transcript) at 322-347; **Exhibit 5** (Manufacture's Package Insert for M-M-R II) (listing cell lines from aborted fetal material) at ¶11.

46.    Ms. Thrift is opposed to receiving the Required Vaccines because she believes their ingredients are spiritually tainted material from dead and altered entities that would pollute and violate the sanctity of her body and spiritual integrity endowed therein and cultivated by her daily religious practices.

47.    Ms. Thrift is also opposed to receiving the Required Vaccines because she believes that taking them manipulates her faith. She believes that sickness and detoxification are innate, natural conditions divinely engineered into the creation and purpose of the human body. She believes spiritually tainted materials in the Required Vaccines hijack the divine process and experience of cleansing, detoxifying, and purifying the god-designed, god-created human body.

48.    Ms. Thrift believes that karma/action in life has results, and to take an action that goes against her religious beliefs is unconscionable and a moral offense. She believes that receiving the Required Vaccines is a direct affront to her religious and spiritual beliefs, hinders her life purpose, and thwarts her spiritual progress. Taking the Required Vaccines creates karma that would compromise her true nature and impede her self-realization and self-liberation, which, by testimony, are her inherent birth rights as a human of god's creation.

49.    On September 14, 2021, UCLA Human Resources conducted an interactive video interview with Ms. Thrift wherein the sincerity and religious nature

of her beliefs were questioned and evaluated. Ms. Thrift understood that she had to attend this interview to have her exemption granted. She reluctantly complied because she prefers not to publicize her beliefs. In Ms. Thrift's experience, the present-day world is hostile toward deep spirituality, dharma, and religion if it does not look like a cathedral, is not prefaced as "mythology," or is presented as more than physical exercise as in the case of "yoga." Ms. Thrift respects the god-given free will every human has and recognizes the spiritual nature of all beings. However, based on her understanding of her place in god's creation, she does not tell people what to do about how they manage their lives.

50.     Based on Ms. Thrift's religious exemption application and the responses she provided during her video interview, UCLA determined that Ms. Thrift's religious beliefs and objections to receiving vaccination were sincere and granted her a religious exemption to its COVID-19 vaccine requirement on September 26, 2022. **Exhibit 6** (UCLA's approval of Plaintiff's religious exemption request).

## II.     PLAINTIFF'S ENROLLMENT AND DETAILS OF HER MLIS PROGRAM

51.     UCLA provides Ms. Thrift a tuition reduction as part of her employee benefits package. She uses this employee benefit to attend UCLA as a part-time graduate student. She enrolled in the UCLA MLIS Program in the fall of 2023.

52.     The Policy requires students to provide proof of vaccination "prior to entering and enrolling at the University of California" (Ex. 1 at 1); nonetheless, UCLA routinely permits students to enroll and take courses without complying with the Policy. *See also* Ex. 2 at 3, ¶ B.1 ("All Incoming Students must enter their vaccination history and/or disease-specific antibody titers directly into their electronic medical record … prior to their first term of enrollment"); *Cf* Ex. 3 at 2

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

(medical exemption policy permitting unvaccinated students to enroll and attend class while the medical exemption request and appeal are processed).

53.     In fact, UCLA permitted Ms. Thrift to complete her first quarter at UCLA and enroll in her second quarter, and she is currently attending class for the current quarter. During her first quarter, Ms. Thrift's courses involved leaving the classroom and touring several locations on campus.

54.     For four months, Ms. Thrift has been permitted to attend classes and go on campus as a student without having shown she complied with the Policy.

## III.     UNIVERSITY OF CALIFORNIA VACCINATION POLICY

### A.     Defendants' Categorical "No Religious Exemption Policy"

55.     Upon belief, UC permitted religious exemptions to its vaccine requirements prior to 2016. However, in the summer of 2015, UC assembled the Immunization Exemption Policy Committee ("**IEPC**"), which recommended that UC eliminate religious exemptions. UC adopted this recommendation in the fall of 2016. Ex. 2 at 8. Upon belief, the IEPC and UC administrators involved in removing the religious exemption did so out of hostility and intolerance towards religious beliefs that conflicted with vaccination.

56.     Defendants' stated interest in promulgating the Policy was to mitigate the risk of students contracting vaccine-preventable illnesses that could be acquired at a UC facility (*id*. at 1) and that the "diseases targeted by this Policy include those that are spread by respiratory transmission, and therefore can pose a risk to others attending classes, living in residence halls, using other University facilities or attending University events." *Id*.

57.     Based on her age and history, Defendants require that Ms. Thrift show proof of receiving two doses of MMR vaccine, two doses of varicella (chicken pox) vaccine, and one dose of Tdap vaccine to continue in the MLIS Program. Ex. 1 at 1.

58.     Ms. Thrift provided her childhood vaccine records to UCLA on October

13

18, 2023.

59.     Ms. Thrift's childhood vaccination records meet UC's requirements for Tdap vaccination. However, the record documents one dose of MMR vaccine. Ms. Thrift was given routine childhood vaccinations based on her parents' choices, authority, and belief that she could not attend school without the required vaccines. However, even as a child, Ms. Thrift felt distressed about receiving a vaccine even though her religious beliefs were not fully developed, and she did not have the legal authority to make her own medical decisions. As an adult, Ms. Thrift has developed her own religious beliefs and understanding of the supreme god and the purpose of life and death, and these beliefs oppose vaccination.

60.     Ms. Thrift did not receive the varicella vaccine as a child because this vaccine did not exist then, and she was infected with the virus as a child. However, the Policy does not permit a "history of chickenpox" to satisfy the varicella vaccine requirement. **Exhibit 7** (Immunization Requirement Fact Sheet) at 1. The Policy permits laboratory proof of immunity from natural infection. *Id*. However, Ms. Thrift's religious beliefs prevent her from donating blood, giving blood, or receiving an organ donation.

61.     Thus, according to Defendants' Policy, Ms. Thrift is missing one MMR dose and two varicella vaccine doses.

62.     As noted above, the Policy permits medical exemptions for the Required Vaccines. *See* Ex. 3. These secular exemptions are reviewed on a case-by-case, individualized basis, and UC representatives reviewing medical exemption requests possess significant discretion to approve or deny each request. *Id*.

63.     However, no commensurate exemption process is available to those with religious objections to the Policy. Defendants' Policy makes clear that "Requests for exemptions for non-medical reasons will be denied and are not eligible for appeal." Ex. 2 at 1.

64. Defendants' Policy purports to pertain to diseases "that are spread by respiratory transmission and therefore can pose a risk to others attending classes, living in residence halls, using other University facilities or attending University events"[3] Ex. 2 at 2.

65. Considered in context, Defendants' justifications for the Policy are nonsensical. While Defendants "require" COVID-19 and influenza vaccines, students and employees are permitted to opt out of receiving these vaccines for any reason whatsoever, including secular reasons, personal preference, or no reason at all.

66. In the past four years, UCLA has permitted 10,358 opt-outs for COVID-19 and 6,734 opt-outs for influenza. **Exhibit 8** (Jan. 29, 20243, FOIA production letter from UCLA).

67. COVID-19 and influenza are illnesses spread by respiratory secretions and are potentially contagious in an office, classroom, and residential setting. Those illnesses are also both highly transmissible (from a comparison perspective) and have been claimed to cause more serious adverse effects, including more hospitalizations

---

[3] Varicella vaccine is a live virus vaccine, meaning there is a modified, live chicken pox virus in each dose. Those vaccinated with this live virus can infect others with the chicken pox virus for up to six weeks after receipt of the vaccine. This is why its package insert, approved by FDA, explains "that transmission of varicella vaccine virus (Oka/Merck) resulting in varicella infection including disseminated disease may occur between vaccine recipients (who develop or do not develop a varicella-like rash) and contacts susceptible to varicella including healthy as well as high-risk individuals" and that "[d]ue to concern for transmission of vaccine virus, vaccine recipients should attempt to avoid whenever possible close association with susceptible high-risk individuals for up to six weeks following vaccination" including "[i]mmunocomposed individuals [and] [p]reganant women … [and] [n]ewborn infants of mothers without documented history of varicella." https://www.fda.gov/media/76008/download?attachment. Nonetheless, Defendants do not exclude those vaccinated with this product from UC for six weeks after vaccination to prevent potential spread.

and deaths, than those illnesses contained in the Policy for which vaccination is required.

68.   Thus, the Policy prohibits Ms. Thrift from receiving a religious accommodation to vaccines for diseases that generally cause mild illness (and at least one for which she has already had). Meanwhile, the Defendants permit students and employees to opt out of COVID-19 and influenza vaccines for any reason at all. Ex. 10 at 20, 22; Ex. 8.

**B.   Defendants' Discretionary Medical Exemption Scheme**

69.   As noted above, Defendants' discretionary medical exemption scheme permits a medical exemption option for any required vaccine. Ex. 3; **Exhibit 9** (University of California Medical Exemption Request Form).

70.   The medical exemption scheme contains multiple levels of individualized discretionary review. *Id.*

71.   At the first level, Defendants have delegated private health care providers discretion to determine what broad variety of circumstances they consider eligible for a medical exemption and which they do not. *Id.*

72.   Students seeking a medical exemption must have a health professional complete Defendants' Medical Exemption Request Form, which lists three options for obtaining the exemption. Ex. 9 at 1.

73.   The three options are: "(a) the applicable CDC contraindication to this vaccine, (b) the applicable manufacturer's vaccine insert contraindication to this vaccine, or (c) the physical condition of the person or medical circumstances relating to the person that are such that immunization is not considered safe, indicating the specific nature of the medical condition or circumstances that contraindicate immunization with this vaccine." Ex. 9 at 1. Space is then provided for the health professional to describe the contraindication(s).

74.   At the second level of Defendants' discretionary process, the medical

16

exemption is reviewed on an individual basis by the local Medical Director for Student Health Services at the student's campus. If the Health Director believes the information provided in the request does not meet the requirements of the Policy or is ambiguous or insufficient, the Health Director possesses discretion to deny the request. *Id*.

75.     At the third level of discretionary review, if the medical exemption request is denied, the student can appeal the denial to a committee to "evaluate medical exemption request denied at the campus level." *Id*.

76.     The panel has the latitude to uphold or overturn the denial of medical exemption.

77.     The appeal process can take up to 60 days, and the unvaccinated student is permitted to remain enrolled in classes and register for the upcoming academic quarter in which the appeal is received. *Id*. Even if the committee upholds the denial, the student is permitted to remain in class until the completion of the quarter. *Id*.

78.     Critically, if an outbreak of a vaccine-preventable illness occurs on campus, unvaccinated students with a medical exemption are not subject to an automatic exclusion; instead, each case is determined on a case-by-case basis. *Id*.

79.     In sum, Defendants dictate what circumstances to consider when evaluating whether a student possesses a qualifying condition for a medical exemption. Defendants require a specific form that must be completed by health professionals. Health professionals are instructed to refer to guidance issued by vaccine manufacturers and the CDC for valid exemption conditions, which guidance itself is, in multiple instances, amorphous, ambiguous, and subjective. Health professionals can also use their discretion to conclude that the physical condition or the medical circumstances relating to the patient renders vaccination unsafe. Through the Medical Exemption Form, Defendants use their discretion to determine what

circumstances qualify for a medical exemption and, by omission, which circumstances do not.

80.    Defendants have determined that medical exemptions are appropriate and have implemented a discretionary review process by which students who seek medical exemptions may have their individual situations reviewed and either approved or denied on an individual and granular level.

81.    A similar exemption process is wholly unavailable to students with religious objections to the Policy.

**C.    *Defendants Permit Comparable Secular Activity, and the Policy is Substantially Underinclusive***

82.    Since instituting the Policy, Defendants have granted medical exemptions to each of the vaccines for which general opt-outs are not available and have provided numerous generalized opt-outs for COVID-19 and influenza vaccinations pursuant to its policies.

83.    Defendants have granted medical exemptions to students attending classes and interacting with other students and staff at UCLA campuses and facilities.

84.    For example, in the past four years, UCLA has granted 1,185 medical exemptions. Ex. 8. Of these, 386 were for the measles, mumps, rubella, and varicella vaccines, the same vaccines that Defendants require Ms. Thrift to receive to continue in the MLIS program. *Id*.

85.    From a risk perspective, and even assuming for argument's sake that unvaccinated individuals pose a risk, one student with a medical exemption to the Policy poses the same risk to Defendants' purported goal as allowing Plaintiff a religious exemption. Considering that Plaintiff neither resides on campus nor attends classes full-time and is already permitted at UCLA facilities as an employee in which she routinely interacts with students as part of her duties, granting a religious

18

exemption to Ms. Thrift is less harmful to Defendant's stated goal than granting a secular exemption to a full-time student who resides on campus.

86.     On belief, no students that Ms. Thrift attends classes with or would attend class with are immunocompromised. In fact, any argument that the Policy is required to protect such children is fiction, as critically immunocompromised students would not be found in public classroom settings, where they could be exposed to various diseases. And, underscoring this reality, Defendants do not require mitigation measures for the student body as a whole for immunocompromised students to mitigate against diseases that are not vaccine-preventable, such as social distancing, sanitation, or other steps for classes immunocompromised students are enrolled in.

87.     On belief, Defendants do not strictly enforce the Policy and permit functional exemptions through non-enforcement of the Policy. In other words, Defendants permit students lacking one or more of the Required Vaccines to attend class, even though they are non-compliant with the Policy. In any event, Defendants do not require immediate compliance and permit countless students on campus to be non-compliant with the Policy. Ex. 3 at 2.

88.     Defendants also permit employees, faculty, and staff, who may be unvaccinated or not be fully up to date with the vaccines required for students, to roam freely throughout their campuses and facilities without adhering to enhanced safety protocols.

89.     Defendants permit the public, including countless numbers of California citizens who remain unvaccinated or partially unvaccinated for any reason they choose, including secular reasons, to access Defendants' facilities without showing proof of vaccination.

90.     Critically, Defendants permit members of the public to attend high density events in which there are large crowds gathered in close proximity, such as

UC basketball and football games, without showing proof of vaccination. In fact, each year, "an estimated half-million people visit [UCLA] to enjoy more than 1,000 [events]." https://luskinconferencecenter.ucla.edu/about/things-to-do-ucla-old/.

91.     However, Defendants prohibit Plaintiff from receiving an education based on her religious objections to the Policy, although she works on-site at UCLA facilities every week and has done so for years. Defendants, therefore, additionally prevent Plaintiff from accessing her employment benefit of tuition reduction.

92.     Collectively, the aggregation of individual secular behaviors Defendants permits arguably poses an infinitely greater threat to any possible goal undergirding the Policy than permitting Plaintiff to access the State's educational benefits and her employee benefits with a religious exemption to the Policy.

93.     Nearly every university across the country has a mandatory vaccination policy. However, the overwhelming majority of these universities have a process for students to seek a religious and/or medical exemption to their vaccination requirements. And, generally, where permitted, these exemptions reflect a statistically small number of students.

94.     These universities have demonstrated that their goal undergirding vaccination requirements can be satisfied while simultaneously respecting students' religious freedoms.

95.     Universities with a religious exemption process deploy a variety of tactics, such as quarantine in the event of an outbreak or masking, distancing, sanitation, etc. (though UC does not require any of these measures for those with medical exemptions). Indeed, if vaccination mitigates the transmission of disease, as UC claims is the reason for the Policy, then a handful of religious exemptions present no risk to the remaining vaccinated students.

96.     Moreover, the Policy also fails to regulate enough conduct to satisfy Defendants' goal. In short, the Policy is glaringly and substantially underinclusive

relative to the objectives Defendants seek to achieve. For example, Defendants' secular activity – including sporting events, concerts, conferences, graduation ceremonies, or any other student and/or community gatherings on or off Defendants' campuses and facilities – does not require proof of vaccination. In fact, each year, "an estimated half-million people visit [UCLA] to enjoy more than 1,000 [events]." https://luskinconferencecenter.ucla.edu/about/things-to-do-ucla-old/. These mass gatherings would, accepting Defendants' proposition that unvaccinated individuals pose any risk, pose a significantly greater risk to Defendants' goal to mitigate against infectious disease spread than permitting Ms. Thrift to pursue her education with a process for obtaining a religious exemption.

97.     Furthermore, the Required Vaccines are not mandated for UCLA employees. This includes Ms. Thrift, who is permitted to be on the UCLA campus as an employee and who reports to UC facilities every week.

98.     However, because of her religious objections to receiving the Required Vaccinations, Defendants are prohibiting Ms. Thrift from completing the MLIS Program by placing a registration hold on her account that prevents her from registering for any additional courses.

99.     Notwithstanding the registration hold, Ms. Thrift can, however, spend countless hours working at UC facilities, visiting the library, swimming in the aquatic center, eating and shopping on campus, or attending sporting or other events on Defendants' campuses or facilities, just as any student or other member of the public can and does. As such, the Policy does not mitigate against the purported risk of transmission in UC facilities, and therefore, it is severely underinclusive.

100.    The Policy is also underinclusive relative to Defendants' goal because it permits medical exemptions for students; thus, unvaccinated students possessing medical exemptions can receive an education at UC (including full-time students and those who reside in campus housing). The Policy also permits those

unvaccinated students with medical exemptions, who are also employees, to access the employment benefit of tuition reduction, but not those with religious objections to receiving vaccines.

101.   If a full-time student with a medical exemption living on campus can safely attend class instruction, then Ms. Thrift, a part-time student who does not reside on campus, can enroll in and attend classes without endangering Defendants' goal.

102.   The Policy's substantial under-inclusivity is further magnified by the fact that UC's employees are not subjected to the Policy and because there are no vaccine requirements in nearly any other aspect of life on campus. As an employee, Ms. Thrift can work at UC facilities but cannot sit in a UC classroom as a student.

103.   The Policy is further substantially underinclusive because Defendants permit students to opt out of some required vaccines, COVID-19 and influenza, which are also meant to protect from contagious viruses spread via respiratory secretions.[4] **Exhibit 10** (University of California – Policy on Vaccination Programs – With Interim Revisions) at 20- 24.

104.   The Policy is also overbroad because it captures more conduct than necessary to achieve its goal. First, the Policy fails to include a reasonable religious exemption for the minuscule fraction of students who, like Ms. Thrift, hold sincere religious beliefs in conflict with the Policy.

105.   Second, assuming the Required Vaccines provide the protection that Defendants claim and considering that the overwhelming majority of UC's students

---

[4]   In 2021, UC only permitted employees and students to avoid its COVID-19 vaccine requirements for religious or medical reasons. UC has since implemented an opt-out process for its COVID-19 requirement, permitting employees and students to avoid this vaccine requirement without providing any reason for doing so. Ex. 8; Ex. 10 at 20, 22.

are compliant with the Policy, Defendants do not meaningfully advance their goal by forcing Ms. Thrift to violate her sincerely held religious beliefs by receiving the Required Vaccines.

106.   However, despite these realities, Defendants destroyed the option for religious exemptions, a plainly overbroad application of its justification for requiring vaccination to mitigate the spread of infectious diseases.

## IV.   PLAINTIFF HAS SINCERELY HELD RELIGIOUS CONVICTIONS THAT PREVENT HER FROM RECEIVING THE REQUIRED VACCINES

107.   Receiving the Required Vaccines is not compatible with Ms. Thrift's faith for a multitude of reasons, which Ms. Thrift shared with Defendants when she submitted her religious exemption request in 2021. Ms. Thrift was also required to undergo an interactive interview with human resources, even though Ms. Thrift holds confidential most of her religious beliefs and practices. *See supra* ¶¶ 43-47.

108.   Defendants have already conceded that Ms. Thrift holds sincere and religious convictions against vaccinations by granting her a previous religious exemption to vaccination—and did so after scrutinizing her beliefs via the interview process.

109.   Nonetheless, Ms. Thrift again shared her beliefs with Defendants by submitting a letter on February 5, 2024, to the employee at the Authur Ashe  that articulates her beliefs and objections to receiving the Required Vaccines.

### A.   Defendants Attempt to Compel Ms. Thrift to Violate Her Beliefs

110.   On September 29, 2023, Ms. Thrift matriculated as a part-time MLIS student when she was accepted into the MLIS Program, paid tuition, and began taking courses. Ms. Thrift is in her second quarter at UCLA and is currently permitted to attend class. The current (winter) quarter ends on March 22, 2024.

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

111.   Nonetheless, Defendants placed a registration hold on Ms. Thrift's account because of her religious beliefs that preclude vaccination. Ms. Thrift is missing one dose of MMR and two doses of varicella vaccine.

112.   On November 21, 2023, Ms. Thrift spoke with an employee at the Ashe Center, seeking a religious exemption to the Policy, and was told that no religious exemption option existed. Ms. Thrift explained, to no avail, that UCLA previously granted her a religious exemption to its vaccine mandate.

113.   Despite the Policy, the Ashe Center employee granted Ms. Thrift an extension to comply until December 31, 2023, permitting her to register for courses for the current winter quarter.

114.   Since then, UCLA has designated Ms. Thrift as "non-compliant" with the Policy and has again placed a registration hold on her account, prohibiting her from registering for any more courses.

115.   Thus, she can complete the current winter quarter, but she is prevented from registering for any classes in the future.

116.   Defendants could accommodate Ms. Thrift, if transmissible disease is actually their concern, by requiring her to adhere to the same restrictions as students with a medical exemption.

117.   Instead of allowing Ms. Thrift to utilize less burdensome alternatives, which would allow her to maintain her religious convictions against vaccination, pursue her educational goals, and access her employment benefit, Defendants insist that she violate her religious integrity as a term and condition of receiving a public education at UC and accessing her employment benefit of tuition reduction.

118.   Defendants' Policy is in sharp conflict with Ms. Thrift's religious beliefs and practices.

119.   Registration opens for the spring quarter on February 15, 2024. Class instruction begins on March 27, 2024, and tuition is due on March 20, 2024. The last day for Ms. Thrift to enroll is April 12, 2024, after which classes cannot be added.

120.   Because of Defendants' prohibition of religious exemptions under the Policy, should Defendants not lift the hold on her account, Ms. Thrift will be forced to request Planned Educational Leave ("**PELP**"), which will force her to skip the next quarter of classes. If she does not apply for the leave, she risks being unenrolled in the MLIS Program and may never be permitted back to complete the program. Ms. Thrift's PELP application must be approved by a graduate advisor at UCLA, and that must occur by April 12, 2024, or she risks disenrollment from the MLIS Program.

121.   If she is disenrolled, Ms. Thrift would be forced to reapply in the future in a highly discretionary process that likely means she will never be able to complete the MLIS Program or access her employment benefit of tuition reduction.

122.   She will lose the time, benefits of her credits, and the money spent on those credits if unenrolled.

123.   Ms. Thrift faces constant coercion to violate her religious beliefs in order to continue her education and use her employee benefit of reduced tuition.

**B.   Defendants' Policy Substantially Burdens the Free Exercise of Plaintiff's Religious Beliefs**

124.   Defendants' Policy substantially burdens Ms. Thrift's religious beliefs.

125.   Ms. Thrift cannot uphold her religious convictions and simultaneously satisfy Defendants' Policy in order to pursue an education at institutions controlled by Defendants.

126.   Ms. Thrift is a taxpayer seeking to further her professional status and career prospects, but Defendants deny her these opportunities because of her religious beliefs.

127.   Ms. Thrift is an employee at UCLA, and Defendants deny her the opportunity to access her employee benefits because of her religious beliefs.

128.   Defendants' Policy permitted Ms. Thrift to matriculate and enroll/attend two quarters of courses. Yet, they now claim that her religious beliefs pose a barrier to continued enrollment, resulting in loss of Constitutional rights, financial losses, loss of employee benefits, and extreme stress to Ms. Thrift.

## COUNT I
## 42 U.S.C. § 1983
## VIOLATION OF PLAINTIFF'S FIRST AMENDMENT FREE EXERCISE RIGHT
### For Declaratory and Injunctive Relief

129.   Plaintiff incorporates the allegations in the foregoing paragraphs as if set forth fully herein.

130.   The First Amendment of the U.S. Constitution provides that: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."

131.   The Supreme Court recently reaffirmed that the First Amendment's Free Exercise Clause "does perhaps its most important work by protecting the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through 'the performance of (or abstention from) physical acts.'" *Kennedy v. Bremerton Sch. Dist.*, 142 S.Ct. 2407, 2421 (2022) (*quoting Employment Div.* v *Smith*, 494 U. S. at 877).

132.   The Supreme Court has repeatedly recognized that "[t]he free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires." *Smith*, 494 U.S. 872 at 877.

133.   "In applying the Free Exercise Clause, courts may not inquire into the truth, validity, or reasonableness of a claimant's religious beliefs." *Hobbie v. Unemployment Appeals Comm'n*, 480 U.S. 136, 144, n.9 (1987).

134. The "guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect." *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 715-16 (1981).

135. "Courts are not arbiters of scriptural interpretation," *id.,* and should not inquire into the validity or plausibility of a person's beliefs; instead, the task is to determine whether "the beliefs professed [] are sincerely held and whether they are, in [a believer's] own scheme of things, religious." *United States v. Seeger*, 380 U.S. 163, 185 (1965).

136. Defendants' actions threaten Ms. Thrift's ability to "live out [her] faith[] in daily life" by forcing her to compromise her strongly held religious objections to vaccination while permitting secular exemptions to these same requirements. *Kennedy*, 142 S. Ct. at 2421 (quoting *Smith*, 494 U.S. at 877).

137. While the right of free exercise does not relieve citizens of their obligations to comply with a valid and neutral law of general applicability, "[t]he Free Exercise Clause commits government itself to religious tolerance," and a law that is not neutral or generally applicable "must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." *Church of Lukumi,* 508 U.S. at 531-32.

138. Strict scrutiny review is triggered if the law in question either is not generally applicable, or if it lacks neutrality. *See, e.g., Fulton,* 141 S. Ct. 1868, 1877 (lack of general applicability alone triggered strict scrutiny review); *Masterpiece Cakeshop*, 138 S.Ct. at 1729 (non-neutrality alone invoked strict scrutiny).

139. The Policy fails both the general applicability and neutrality tests.

140. The Policy is not narrowly tailored, is overinclusive, and substantially underinclusive.

141. The Policy fails strict scrutiny and, at least applied to students such as Ms. Thrift, would fail even rational basis review.

142.   Therefore, as applied specifically to Ms. Thrift, the Policy violates Ms. Thrift's right to free exercise of religion.

### INJUNCTIVE RELIEF ALLEGATIONS

143.   Plaintiff incorporates the allegations in the foregoing paragraphs as if set forth fully herein.

144.   Plaintiff alleges that as applied specifically to her situation, the Policy violates her First Amendment rights and her right to be free from unconstitutional government actions.

145.   Plaintiff is being and will continue to be irreparably harmed unless this Court enjoins Defendants from enforcing the Policy against her without providing the option for a religious exemption process.

146.   Plaintiff has no plain, speedy, and adequate remedy at law to prevent Defendants from enforcing the Policy against her.

147.   If not enjoined by this Court, Defendants will continue to implement and enforce the Policy in violation of Plaintiff's constitutional rights.

148.   Moreover, without a preliminary injunction preserving the status quo, Plaintiff will suffer an impending loss of education, her professional prospects, and employee benefits. She will continue to be coerced to violate her religious objections. In any event, the facts and law clearly favor the Plaintiff.

149.   The status quo that proceeded this controversy was that Plaintiff enrolled and matriculated in UCLA's MLIS Program and is currently enrolled in her second quarter and attending classes each week.

150.   Accordingly, the Court must apply the prohibitory injunction standard.

151.   The laws and facts are clearly in Ms. Thrift's favor. Without an injunction, Ms. Thrift, a taxpayer, and citizen of California, will be deprived of pursuing an education at UC, a public institution. This amounts to extreme harm wherein compensation for damages is inadequate to cure the harm.

152. Ms. Thrift's injuries—past, ongoing, and imminent—cannot be remedied by a later-issued court order.

153. The remaining injunction factors—the balance of harms and public interest—merge where there is a loss of constitutional rights. *See Tandon*, 141 S. Ct. at 1297; *Nken v. Holder*, 556 U.S. 418, 435 (2009).

154. Accordingly, considering the foregoing, injunctive relief is appropriate.

## DECLARATORY RELIEF ALLEGATIONS

155. Plaintiff incorporates the allegations in the foregoing paragraphs as if set forth fully herein.

156. Plaintiff is entitled to a declaratory judgment pursuant to 28 U.S.C. § 2201. An actual and substantial controversy exists between Plaintiff and Defendants as to Plaintiff's legal rights and duties with respect to whether the Policy—which allows for secular but not religious exemptions—therefore violates the United States Constitution.

157. The case is presently justiciable because the Policy does not provide for any religious exemption process and so Plaintiff is prohibited from continuing in UCLA's MLIS Program after this quarter and, as of February 6, 2024, from enrolling in any classes for next quarter.

158. Declaratory relief is, therefore, appropriate to resolve this controversy.

## PRAYER FOR RELIEF

159. Pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, it is appropriate and proper that a declaratory judgment be issued by this Court, declaring that the Policy is unconstitutional as applied to Plaintiff.

160. Pursuant to 28 U.S.C. § 2202 and Fed. R. Civ. P. 65, it is appropriate and hereby requested that the Court issue a preliminary and permanent injunction prohibiting Defendants from enforcing the Policy against Plaintiff without providing the option for a religious exemption.

161.   WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment against Defendants and provide Plaintiff with the following relief:

a)   Declare the "no religious accommodation" policy, as applied specifically to Ms. Thrift, unconstitutional;

b)   Preliminarily and permanently enjoin Defendants, their agents, servants, employees, and any other persons acting on their behalf from implementing and enforcing the Policy against Ms. Thrift without providing the option for a religious exemption;

c)   Grant Plaintiff her costs and attorneys' fees under 42 U.S.C. § 1988, and any other applicable authority; and

d)   For such and other relief as this Court deems just and proper.

Dated: February 6, 2024

Respectfully submitted by,
SIRI & GLIMSTAD LLP

By: */s/ Catherine E. Ybarra*
Catherine Ybarra (SBN 283360)
Email: cybarra@sirillp.com
700 S. Flower Street, Suite 1000
Los Angeles, CA 90017
Telephone 213-376-3739
Facsimile 646-417-5967

Allison R. Lucas (*pro hac vice filed concurrently*)
Email: alucas@sirillp.com
220 West Congress Street, 2nd Floor
Detroit, MI 48226
Telephone 313-251-9161
Facsimile 646-417-5967

Aaron Siri (*pro hac vice filed*

30

*concurrently*)
aaron@sirillp.com
Elizabeth A. Brehm (*pro hac vice filed concurrently*)
Email: ebrehm@sirillp.com
745 Fifth Avenue, Suite 500
New York, NY 10151
Telephone 212-532-1091
Facsimile 646-417-5967

CHRIS WIEST ATTORNEY AT LAW, PLLC
Christopher Wiest (*pro hac vice filed concurrently*)
Email: chris@cwiestlaw.com
50 E. Rivercenter Blvd., Suite 1280
Covington, KY 41011
Telephone: 513-257-1895
Facsimile: 859-495-0803

*Attorneys for Plaintiff*
Suran Thrift

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## **<u>VERIFICATION</u>**

I, Suran Thrift, a citizen of the United States and of the state of California, have read the foregoing Verified Compliant and know the contents thereof as to myself and that the same is true to my own knowledge and as to all other matters on information and belief and I believe them to be true.

I verify under penalty of perjury that the foregoing is true and correct.

Executed on ___02 / 06 / 2024_____ in Los Angeles, California.

_____
Suran Thrift

32